Albert SOUZA, et al., Plaintiffs,

v.

ESTATE OF Bernice Pauahi BISHOP,
et al., Defendants,

and

Olita Merseberg, et al., Indispensable
Parties.

Civ. No. 79–0339.

United States District Court,
D. Hawaii.

Oct. 5, 1984.

Alvin H. Goldstein, Charles J. Wisch, San Francisco, Cal., for plaintiff.

Martin Anderson and Mark B. Desmarais, Goodsill, Anderson, Quinn & Stifel, Honolulu, Hawaii, for Castle defendants.

Harold W. Nickelsen, G. Richard Morry, J. Stephen Street, Honolulu, Hawaii, for Bishop Estate.

Michael C. Webb, Lawrence S. Okinaga, Honolulu, Hawaii, for indispensable parties, State Sav. & Loan Ass'n and Oahu Educ. Employees Federal Credit Union.

## OPINION

RUSSELL E. SMITH, District Judge.

### BACKGROUND

This case, in which motions and cross-motions for summary judgment have been filed, presents difficult problems relating to land usage in Hawaii. The Hawaii Legislature has been considering these problems for over two decades and in 1967 enacted the Hawaiian Land Reform Act (Act), Hawaii Rev.Stat., ch. 516, which permits the State under some circumstances to condemn the fee of leased lands and transfer the fee to the lessees of the land. The Supreme Court of the United States in *Hawaii Housing Authority v. Midkiff,* —— U.S. ——, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), held that the State land oligopoly, traceable to the monarch, could be regulated and that the Act was constitutional.

In this case the plaintiffs Chun and Merseberg seek relief from the defendants under the Sherman and Clayton Acts, and their Hawaii equivalents and the Hawaii Fair Trade Statutes, because of dealings with the Bishop Estate.[1] In 1966 Chun and Merseberg leased separate residential sites

---

1. While the third amended complaint charges the Castle defendants with monopoly, there is no evidence of such, and the plaintiffs do not argue that there is. The fourth amended complaint omits the monopoly charges against the Castle defendants.

in the Halawa Valley Estates on Oahu. The Bishop Estate owned the land and leased it to American Factors, which in turn subleased it. Ultimately one Ujimori built houses on the land, and it was he who dealt with the plaintiffs here. The plaintiffs entered into two separate agreements—one for the purchase from Ujimori of the house and the off-site improvements and the other for the lease of the land. Except for the names and dates, the plaintiffs' leases are identical. Parties to the leases are the Bishop Estate and a joint venture consisting of Central Oahu Land Company and Hawaiian Pacific Industries, lessors, and the plaintiffs, lessees. The terms of the leases are 55 years. The lease rents are $165 per year for forty years; the rents for the remaining fifteen years are to be determined by agreement or by arbitration. There are options to extend the leases, and the rents during the periods of extension are to be similarly determined by agreement or by arbitration. The arbitrations are to some extent controlled by specific formulae. The plaintiffs are to pay all taxes and levies for special improvements, and at the end of the term are privileged to remove all buildings. The effect of all of this is that upon the termination of the leases the lands together with all off-site improvements will revert to the Bishop Estate.

The plaintiffs' transactions were typical of the manner in which the Bishop Estate lands were subdivided and sold, and while the Bishop Estate played no active role in the subdivision of the lands, the construction of off-site improvements, and the construction of the houses, it is clear that the Bishop Estate orchestrated all that was done.

A jury might find that most people desiring to buy homesites on Oahu could not readily find fee land which they could acquire or lease land upon which they themselves could build. A jury might likewise find that the Bishop Estate developed its land as it did because it believed that, for tax and other reasons, it was economically advantageous to lease the land rather than to sell it. A jury might also find that these practices resulted in excessive prices and that the Bishop Estate was motivated by profit.

Assuming that the Bishop Estate plan is antisocial, results in excessive prices, and that on the expiration of the leases many leaseholders will suffer some hardship, still the question remains: Were the antitrust laws violated?

## THE MONOPOLIZATION CLAIM

In 1966 Section 2 of the Sherman Act, 15 U.S.C. § 2, read: "Every person who shall monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty of a misdemeanor ...."

Hawaii Rev.Stat. § 480–9 reads: "No person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State."

Assuming for purposes of this opinion that the sections of the federal and Hawaii statutes dealing with monopolization apply to land,[2] still the rationale of the monopoly cases is difficult to apply when the subject of the monopoly is land. The ordinary antitrust case involves dealings for goods. The market in cameras, for example, is the

---

**2.** This assumption is correct only if there is considerable judicial stretching of the words used in the statutes. So far as the Sherman Act is concerned, the words "trade or commerce between the several States" would seem to exclude land because land obviously cannot be a part of the trade or commerce between the "several States." The Hawaii statute forbids the monopolization of trade or commerce in any "commodity." In common parlance the word "commodity" is not used to describe real estate, and the dictionaries, both general and legal,

defining "commodity" use the words "personal" and "movable" and do not use the term "real estate." In *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207 (9th Cir.1977), the word "commodity" was held not to include land (cemetery lots). But the Hawaii Legislature defines the word "commodity" to include "any other business." Hawaii Rev.Stat. § 480–1(1). Perhaps leasing land is a business, and while there was no dealing for the business of leasing land, perhaps the definition includes land with which the business dealt.

combined willingness of all people to buy cameras. That combined willingness to buy may vary as the quality and price vary. The theory is that competition is healthy and results in lower prices. Each competitor's share of the market depends upon his price and quality. As a competitor's share of the market increases, the share of some of his competitors decreases. One competitor with market power may create impediments which prevent other competitors from entering the market. Not so when the subject matter is land. The quality of land is finite. That quantity does not increase or decrease as the price fluctuates. Landowners may compete in price, and one may sell more land than another at a given time; but normally what one landowner does with his own land does not prevent any other landowner from doing what he will with his own land.

An owner of land has monopoly power over his land. He may charge for it what he will or withhold it from the market if he so desires. He is under no compulsion to use the land for the public benefit or sell it at a price that someone can afford to pay. I think it obvious that the ownership of land is not in itself illegal despite the monopoly power that goes with it.

▌ Historically the Bishop Estate has been the largest landowner in Oahu. Mere size, however, does not make a monopoly illegal. *United States v. International Harvester Co.*, 274 U.S. 693, 708, 47 S.Ct. 748, 753, 71 L.Ed. 1302 (1927); *United States v. United States Steel Corp.*, 251 U.S. 417, 451, 40 S.Ct. 293, 299, 64 L.Ed. 343 (1920); *Deesen v. Professional Golfers' Association*, 358 F.2d 165, 171 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966); *United States v. Aluminum Co.*, 148 F.2d 416, 430 n. 2 (2d Cir. 1945); *Bailey's Bakery, Ltd. v. Continental Baking Co.*, 235 F.Supp. 705, 718 (D.Hawaii 1964), *aff'd*, 401 F.2d 182 (9th Cir.1968), *cert. denied*, 393 U.S. 1086, 89 S.Ct. 874, 21 L.Ed.2d 779 (1969).

▌ I conclude, therefore, that the monopoly power enjoyed by the Bishop Estate over its own vast lands was not in itself illegal, notwithstanding the language in *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). There the Court said that "monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised. For § 2 of the Act is aimed, *inter alia*, at the acquisition or retention of effective market control." *Id.* at 107, 68 S.Ct. at 945. (Footnote and citation omitted.[3]) If the quoted language is taken literally, then the monopoly power which the Bishop Estate had over its own land was illegal. But the Court in *Griffith* was obviously using the word "monopoly" in the context of competitors and was talking about the effect of a monopoly on competitors. The Court cited *United States v. Aluminum Co.*, 148 F.2d 416 (2d Cir.1945), for its authority. In that case Judge Learned Hand said:

> Nevertheless, it is unquestionably true that from the very outset the courts have at least kept in reserve the possibility that the origin of a monopoly may be critical in determining its legality; and for this they had warrant in some of the congressional debates which accompanied the passage of the Act. This notion has usually been expressed by saying that size does not determine guilt; that there must be some "exclusion" of competitors; that the growth must be something else than "natural" or "normal"; that there must be a "wrongful intent," or some other specific intent; or that some "unduly" coercive means must be used. At times there has been emphasis upon the use of the active verb, "monopolize," as the judge noted in the case at bar. What engendered these compunctions is reasonably plain; persons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended ei-

---

**3.** *But see* footnote 10 in *Griffith*, where it is said that "mere size is not outlawed by § 2." 334 U.S. at 107, 68 S.Ct. at 945, *quoting United States v. United States Steel Corp.*, 251 U.S. 417, 451, 40 S.Ct. 293, 299, 64 L.Ed. 343 (1920).

ther to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolists by force of accident. Since the Act makes "monopolizing" a crime, as well as a civil wrong, it would be not only unfair, but presumably contrary to the intent of Congress, to include such instances.

*Id.* at 429–30. (Citations omitted.)

■ During the oral arguments, the court asked counsel for plaintiffs at what time the Bishop Estate's ownership became illegal. Counsel answered that the Sherman Act restraints applied when the Bishop Estate chose to put the land in commerce. The Sherman Act, however, does not regulate the price between an owner and a buyer. The Sherman Act comes into play when an owner uses the power of his ownership to affect competition. As stated in *Griffith*, "the use of monopoly power ... to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *Id.* 334 U.S. at 107, 68 S.Ct. at 945.

The District Court of Hawaii reached the same conclusion in *Bailey's Bakery*, 235 F.Supp. at 718, where it was said that "[t]he Sherman Act does not make mere size nor continued exercise of its lawful power an offense when that size and power have been obtained by lawful means and developed by natural growth—absent the *manifest* purpose or intent to exclude competition." (Footnote omitted.)

The courts have frequently condemned leasing. In the cases where leasing has been condemned, however, it is clear that the leasing was employed as an anticompetitive device. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488 (9th Cir.1977); *United States v. Aluminum Co.*, 148 F.2d 416 (2d Cir.1945); *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), *aff'd*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

■ In this case there is no evidence from which a jury might find that what the Bishop Estate did was anticompetitive. The plaintiffs contend that people want to buy land for homesites in fee and that leases are less desirable. If the Bishop Estate leased only, then if leases were less desirable, the landowners who wished to sell in fee would have been benefited. If other landowners wished to lease, they were free to do so. In any event, the actions of the Bishop Estate did not in any way infringe on the capacity of other landowners to do as they wished with their own land.

The plaintiffs contend that the following clause [4] in Bishop Estate development contract injured competitors:

> DEVELOPER and any organizations controlled by it or any assignees of development rights hereunder shall not directly or indirectly during the term of this agreement without the prior written approval of BISHOP undertake the development of any other land in Central Oahu comprising the ahupuaas from Halawa to Waipio inclusive (except land of the Trustees of the Bernice P. Bishop Museum, land of The Queen's Hospital at South Halawa and land now owned in fee simple by Oahu) *which may interfere with the speedy and orderly subleasing of said land,* provided that nothing herein shall prevent DEVELOPER or any organizations controlled by it in the normal course of their business from supplying materials or credit to other persons undertaking the development of such land.

(Emphasis supplied.) There is no evidence, however, that there was any shortage of developers. Apart from that, the contract itself requires no more than that the developer diligently perform his contract and not engage in other development activity which would prevent him from doing so.

■ Plaintiffs also contend that the Bishop Estate by reason of its power was able to deal with its developers in such a way that the developers made no profits

---

**4.** This clause differs from the clause in the Castle development contract.

out of the initial sale of a residence but recovered their profit over a period of time out of the rents to be paid. The net result was a low initial cost to the home buyer. Plaintiffs theorize that other landowners had no capacity to make development contracts which would result in such low initial costs, and for that reason other developers could not enter the residential lease market. It is not shown that there were landowners who wanted to but did not enter the residential lease market because of the Bishop Estate's low initial cost. On a motion for summary judgment after there has been extensive discovery, the plaintiffs must be able to support their theories by showing some evidence on which a fact finding might be based. There is no such evidence here.[5]

A jury might find that the prices charged by the Bishop Estate, bearing in mind the value of the reversion, were exorbitant and that only because of its monopoly was it able to charge such prices. But the ownership of the land carried with it the right to fix the price and as I see it the right to fix the method in which it should be paid, *i.e.*, in cash or in the reversionary value of the land, improved as it would be.[6]

On the facts presented here, a jury could not find the Bishop Estate to be in violation of Section 2 of the Sherman Act nor of Section 480–9 of the Hawaii Revised Statutes.

### THE STANDARDIZED LEASE

■ Plaintiffs urge that the defendants' actions in connection with the standardization of the lease form was equivalent to price-fixing and was a violation of Section 1 of the Sherman Act and Section 480–4 of the Hawaii Revised Statutes. As previous-

ly indicated, the development patterns of the Bishop Estate and the Castle defendants were similar in the general results reached. There was no uniformity in the prices paid or in the terms of the leases, and the details of the leases differed. All leases had to be approved by the FHA for FHA financing. Both defendants had been leasing for about a decade when in 1960 the FHA contacted all of the large landowners in Hawaii relative to the standardization of a lease form. The leases to the plaintiffs here were on forms approved by the FHA in 1963. The correspondence between the FHA and the landowners indicates that it was the FHA which was urging the standardization. The landowners did meet with each other and discuss the clauses in the standardized form of lease. There is no suggestion in any of the evidence that the FHA was seeking to improve the landowners' position. Rather, it appears that the FHA was on the homeowners' side and wanted clauses in the standardized form which would favor them. For instance, FHA insisted on the elimination of the consent to assignment clause and was successful. The lease forms used here provide for assignment without the consent of the lessor. It does not appear that the landowners agreed and presented a package to the FHA. Rather the landowners agreed reluctantly to some FHA demands. The evidence does not prove a contract between the Bishop Estate and the Castle defendants; rather it proves an acquiescence in some demands made by the FHA.

However, if it can be said that there was some sort of a contract between the landowners to standardize the lease form and

---

5. For the purposes of this theory, the plaintiffs ignore the fact that the Castle defendants' dealings with developers were very similar to those of the Bishop Estate. In another context, the plaintiffs argue that the similarity of the development contracts was evidence of parallel conduct.

In Tax Zones 4–2 to 4–6, where both the Castle defendants and the Bishop Estate owned land in the years between 1946 and 1977, the Castle defendants sold 5,376 leaseholds, and the Bishop Estate sold 3,069. Castle was one of the

smaller large landowners, having 2.45% of the land on Oahu, while Castle & Cook, Inc. had 11.13% and the James Campbell Estate had 13.20%.

6. Consider a tract of land that has been leased for growing crops and either of necessity or by contract the lessee would have to cut brush, level the land, and perhaps dig ditches. Would the lease be invalid merely because, at the end of the lease, the lessor would get back land which had been improved?

that such was in violation of the antitrust laws, still the problem of damages remains. The standardization of the lease form did not bring about the lease-only policy; rather leasing had been the policy for many years. If the plaintiffs were injured by the standardization, it does not appear here just how. It is true that the plaintiffs' theoretical power to negotiate was diminished, but, assuming (contrary to all of plaintiffs' arguments on the monopolization issue) that they had a power to negotiate, they do not point to any clause in the standardized lease that was more onerous than the equivalent clause in previous leases; they do not single out any particular clause in the standard form that was onerous and as to which they would have negotiated; and they do not show how any damages flowed from their lack of power to negotiate.

On the facts presented here, a jury could not find that the plaintiffs suffered any damage because of the defendants' consents to the standardized lease form.

### THE CONSPIRACY CLAIM

■ The plaintiffs assert that the Bishop Estate and the Castle defendants violated Section 1 of the Sherman Act and Hawaii Rev.Stat. § 480–4 by agreeing that they would engage in a lease-only policy, thus restricting the sale of residential lots in fee. The defendants deny any combination or conspiracy. The plaintiffs, conceding that there is no direct evidence of the conspiracy, claim that it may be inferred from a conscious parallel behavior of the defendants.

The acts of the defendants were parallel in that they employed the same general scheme in leasing their land. The defendants made master leases to developers. The effects of the leases were that the developers subdivided the lands and built the on- and off-site improvements and sold those improvements to the homeowners. The land was then sublet to the homeowners for a fixed period, with rights of renewal. The defendants required the developers to sell the houses at no profit and to take their compensation over a period of time by sharing the rentals. The details of

the development contracts made by the Bishop Estate differed among developers and also differed from those of the Castle defendants. Except as to rent and term, the lease forms used by the defendants for the homeowner lessees were identical after the standardization.

By reason of the business, political, and social relationships of the principals and the trustees, the defendants had an opportunity to discuss their mutual problems; they exchanged information and lease forms; and they presented at times a common front in the political arena in matters affecting land ownership and land usage, such as federal income taxes and the efforts of the Hawaii Legislature to impose restrictions on the leasing of land.

The crucial question is whether the defendants' conduct toward the plaintiffs stemmed from independent decision or from an agreement, tacit or express. *Theatre Enterprises v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). The Court of Appeals for the Ninth Circuit has stated that "[the plaintiff] need not show explicit contractual agreements in order to prove a conspiracy, but it must demonstrate more than that the alleged co-conspirators engaged in a course of conduct, even if conscious of each other's parallel behavior, in which they would have engaged regardless of the others' conduct." *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir.1971). In *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665 (9th Cir.1980), the court stated:

Summary judgment may properly be granted in an antitrust action on an allegation of conspiracy where there are understandable and legitimate business reasons for a defendant's conduct. We believe that appellees have supplied an entirely plausible and justifiable explanation of their conduct, one consistent with proper business practices. Absent any evidence of an agreement with Glen-Webb, Ranchers' refusal to deal with

Blair does not constitute an antitrust law violation.

*Id.* at 672. (Citations omitted.)

The defendants' conduct in leasing rather than selling residential lots was based on business judgment. It was the business judgment of the Bishop Estate that its investment in its own land was the best investment that it could make. The philosophy was expressed in 1963 by Trustee Midkiff in this language:

> The value of the Bishop Estate in 1884 was $300,000. The assessed value of 1962 are over 209 million. Holding Mrs. Bishop's lands since the Trust's inception 75 years ago has resulted in increasing its value 696 times since 1884. No other type of corpus, securities, etc. can show any such gain.

The record confirms that the judgment of the defendants was in fact sound. The plaintiffs do not deny that the defendants were motivated by profit; rather, in their argument as to monopolization, they vehemently argue that profit was defendants' motive. The cooperation of the large landowners in agreeing on a lease form is evidence of parallel conduct, but again the landowners wanted to facilitate the financing of their purchase, 90% of which was done through FHA and VA. This constitutes a legitimate business purpose.

It does not appear "that the allegedly parallel acts were against each conspirator's self interest, that is, that the decision to act was not based on a good faith business judgment." *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 884 (9th Cir. 1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983).

On the facts presented here, a jury could not find that the defendants violated Section 1 of the Sherman Act or Section 480–4 of the Hawaii Revised Statutes.

#### THE TYING ARRANGEMENT

■ The plaintiffs assert that the Bishop Estate requirement that the house be built and bought before a sublease was made was in effect a tying arrangement (in violation of Section 1 of the Sherman Act and Hawaii Rev.Stat. §§ 480–4(a) and 480–5) in which the houses were the tying product and the leases were the tied product. The argument is that the homeowner in taking the tied product was required to accept the less desirable lease instead of the more desirable fee.

The concepts underlying the rule against tying do not fit this case. A principal difficulty lies in considering the lease of land and the purchase of a house for a residential dwelling as separate products. The Ninth Circuit, in *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1347 (9th Cir.), *cert. denied*, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982), quoting *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969), said: " 'There is, at the outset of every tie-in case, ... the problem of determining whether two separate products are in fact involved.' " It may be that there is some kind of a market for houses apart from the land, just as there may be a market for automobile engines apart from the whole motor car, but certainly the adjudicated cases are not based on such unusual divisions of a market. We do not visualize residences apart from the land on which they are located. It is the house and the land on which it is located which constitute the package which the ordinary homeowner considers. In this case the plaintiffs bought the package because they wanted to live in the area, and the houses suited their needs. I think that there was a market for residential houses located on a definite lot and that there were neither separate markets nor separate products.

Assuming that there were separate markets, there is no proof in this case that the Bishop Estate had any dominance in the market for the tying product, *i.e.,* houses. As previously stated, the Bishop Estate did have a monopoly power over its own land. But, as to the tying product, while the Bishop Estate in its development contracts directed that the houses be built and reserved the right to approve the plans, and in effect required the homeowner to take the package, there is nothing to show that the houses were unique, that any builder

could not duplicate them, or that there was a lack of builders.

Assuming that the Bishop Estate had some economic power over houses, still it is not shown just how the exercise of that power could affect competitors in the tied product market, *i.e.,* leases of land. Most of the cases in which there has been a finding of an illegal tying arrangement relate the arrangement to a restraint of competition in the market for the tied product. Thus, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), a consumer suit, the policy of the defendant was condemned because of the effect that it had on competing manufacturers of shoe machinery. In *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), an action by the United States, the focus was on the injury to competitors in the tied product—salt. In *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), an action by the United States, the tying product was land, and the injury was the restriction of trade in the transportation market. In *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), where no Sherman Act violation was found, the Court said:

> Tying arrangements, we may readily agree, flout the Sherman Act's policy that competition rule the marts of trade. Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take. Yet "[t]ying agreements serve hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California v. United States,* 337 U.S. 293, 305 [69 S.Ct. 1051, 1058, 93 L.Ed. 1371] (1949).

*Id.* at 605, 73 S.Ct. at 878 (Footnote omitted.)

In *Jefferson Parish Hospital v. Hyde,* —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) the court said:

> It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable "per se." The rule was first enunciated in *International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947), and has been endorsed by this Court many times since. The rule also reflects congressional policies underlying the antitrust laws. In enacting § 3 of the Clayton Act, 15 U.S.C. § 14, Congress expressed great concern about the anticompetitive character of tying arrangements.

*Id.* 104 S.Ct. at 1556–57. (Footnotes omitted.)

■ I am aware that in *United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the Court struck down a tying arrangement that resulted in block-booking. The Supreme Court agreed with the district court finding "that since each defendant by reason of its copyright had a 'monopolistic' position as to each tying product, 'sufficient economic power' to impose an appreciable restraint on free competition in the tied product was present as demanded by the *Northern Pacific* decision." Id. at 48, 83 S.Ct. at 104. Notwithstanding this language, it is not clear to me whether the Court condemned block-booking because of its effect on competition, or whether it considered that the use of monopoly power based on a copyright to require block-booking was an evil in and of itself. Nonetheless I believe that a court, in considering a tying case, should regard the injury to competition in the tied product as a factor. In this case no such injury is proved. As stated in the section of this opinion dealing with the monopolization claim, the fact that one landowner deals with his own land does not prevent any other landowner from dealing with his own land.

On the facts presented here, a jury could not find that there was an unlawful tying arrangement in this case.

## UNFAIR TRADE PRACTICES AND UNFAIR METHODS OF COMPETITION

Hawaii Rev.Stat. § 480–2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." In enacting this statute, the Hawaii Legislature used language similar to that of Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)). Hawaii Rev.Stat. § 480–3 provides: "It is the intent of the legislature that in construing section 480–2 the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act." Section 480–13 provides a private remedy for violations of the Act. The plaintiffs make claims under these statutes.

▮ Unless there is pendant jurisdiction over the claim made under Hawaii Rev. Stat. § 480–2, the court is without jurisdiction. It may well be that, since the court has disposed of the claims made under federal law, there can be no pendant jurisdiction. Thus, in *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the Court said: "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (Footnote omitted.) The Court cited *Wham-O-Manufacturing Co. v. Paradise Manufacturing Co.,* 327 F.2d 748, 752–754 (9th Cir. 1964),[7] but later decisions of the Court of Appeals for the Ninth Circuit, while approving the dismissal of state claims when the federal claims have been denied prior to trial, seem to make the exercise of pendant jurisdiction discretionary. *Schmidt v. Oakland Unified School District,* 662 F.2d 550 (9th Cir.1981); *Sunbeam Lighting Co. v. Pacific Associated Lighting Inc.,* 328 F.2d 300 (9th Cir.1964). In any event, I decline to exercise pendant jurisdiction.

There is no judicial economy to be served in view of the court's disposal of the federal claims.

All of the considerations which persuaded the Supreme Court to abstain in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), are present here. The claims touch a sensitive area of social policy in Hawaii. *See Hawaii Housing Authority v. Midkiff,* — U.S. —, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). They also present difficult problems in the interpretation of the law of Hawaii. The path to be followed is not clear. While Hawaii Rev.Stat. § 480–3 states that decisions of the courts and the Fair Trade Commission shall be the guidelines, those decisions are fashioned for a regulatory scheme in which the Federal Trade Commission has both legislative and judicial power. *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). A problem may arise as to the extent that the provisions of Section 480–2 do incorporate, or should be interpreted by, the provisions of the Hawaii Unfair Practices Act (Hawaii Rev.Stat., ch. 481) and/or the Hawaii Deceptive Trade Practices Act (Hawaii Rev.Stat., ch. 481A). It is necessary to interpret the broad words "unfair methods of competition" and "unfair or deceptive acts or practices." This task is complicated by the fact that most of the concepts involved in the fair trade world grew out of the market dealings in the trade and commerce of movable property and services, and not out of dealings in land.

To paraphrase the Supreme Court in *Railroad Commission v. Pullman Co.,* 312 U.S. at 501, 61 S.Ct. at 645, I should refrain from exercising pendant jurisdiction out of regard for the independence of the government of Hawaii.

## CONTRACTS OF ADHESION

For the reasons previously stated, I refuse to take pendant jurisdiction of the claims made in plaintiffs' eighth cause of action.

---

7. *United Mine Workers,* 383 U.S. at 726 n. 16, 86 S.Ct. at 1139 n. 16.