**WESTERN SUNVIEW PROPERTIES, LLC, et al., Plaintiffs,**

v.

**Irwin FEDERMAN, et al., Defendants.**

**No. CV NO. 03–00463DAE/LEK.**

United States District Court,
D. Hawai'i.

Sept. 15, 2004.

Chuck T. Narikiyo, Chad P. Love, Barbara Jean Kirschenbaum, Love & Narikiyo LLLC, Honolulu, HI, Terrance Matthew Revere, Jacqueline E. Thurston, Brian A. Bilberry, Motooka Yamamoto & Revere LLLC, Honolulu, HI, for Western Sunview Properties, LLC, Guy Hands, Julia Hands, plaintiffs.

Andrew V. Beaman, Leroy E. Colombe, Burnham H. Greeley, Iver N. Larson, Chun Kerr Dodd Beaman & Wong, Honolulu, HI, Mark B. Desmarais, Tom Petrus & Miller LLLC, Honolulu, HI, for Irwin Federman, Concepion S. Federman, defendants.

Sidney K. Ayabe, Ronald Shigekane, Ayabe Chong Nishimoto Sia & Nakamura, Honolulu, HI, for Bluffs at Mauna Kea Community Ass'n., defendant.

J. Douglas Ing, Emi M. Kaimuloa, Watanabe Ing Kawashima & Komeiji, Honolulu, HI, Brian A. Kang, Watanabe, Ing & Kawashima, Honolulu, HI, for Mauna Kea Properties, Inc., Mauna Kea Development Corp., defendants.

Joseph M. Kamelamela, Bobby J.A. Leithead–Todd, Office of the Corporation, Counsel–Big Island, Hilo, HI, for County of Hawai'i, John Does 1–100, Jane Does 1–100, Doe Partnerships 1–100, Doe Corporations 1–100, defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' COUNTER MOTION FOR SUMMARY JUDGMENT*

DAVID ALAN EZRA, Chief Judge.

The court heard Defendants' Motion and Plaintiffs' Counter Motion on August 23, 2004. Chad P. Love, Esq., Terrance M. Revere, Esq., and Barbara J. Kirschenbaum, Esq., appeared at the hearing on behalf of Plaintiffs; Andrew V. Beaman, Esq., Mark B. Desmarais, Esq., and Leroy E. Colombe, Esq., appeared at the hearing on behalf of Defendants Federmans. J. Douglas Ing., Esq., and Emi M. Kaimuloa, Esq., appeared at the hearing on behalf of Mauna Kea Properties, Inc. and Mauna Kea Development Corporation; Ronald Shigekane, Esq., appeared at the hearing on behalf of the Bluffs at Mauna Kea Community Association. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment, and DENIES Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

The parties involved in the instant lawsuit own neighboring oceanfront lots in the Bluffs at Mauna Kea (the "Bluffs"), a community association located in South Kohala, Hawaii. Plaintiff Western Sunview Properties, LLC, a Hawaii Limited Liability Company ("Plaintiff WSP"), owns Lot 5 at the Bluffs. Plaintiffs Guy and Julia Hands ("Plaintiffs Hands") are the managers of Plaintiff WSP who, according to Plaintiffs, invested in the lot for personal, family and household use. Defendants Irwin and Concepcion S. Federman ("Defendants") own Lot 6 at the Bluffs.

The Bluffs is a luxury subdivision at the Mauna Kea Resort on the Kohala Coast of the Big Island. The Bluffs sit in a Special Management Area ("SMA") and Defendant Mauna Kea Properties, Inc. ("MKP"), the developer of the Bluffs, obtained a special management permit ("SMA permit") as part of its development of the resort area. The SMA permit refers to a forty-foot County setback from the shoreline.

All the Bluffs' lots are covered by a Declaration of Protective Covenants, Conditions and Restrictions (the "CCRs"). The CCRs provide for a Design Committee (the "Committee") to review plans for all proposed homes at the Bluffs, including the lots at issue in the instant action. The Committee, pursuant to the CCRs, adopted the Design and Construction Requirements for Homes. *See* Ex. 4 to Defendants' Motion for Summary Judgment. Finally, the lots are also subject to the By–Laws of the Bluffs at Mauna Kea Community Association (the "By–Laws").

According to Defendants, MKP appointed James Bell and William Mielcke to the original Design Committee in September 1996. In December of 2000, James Bell resigned, leaving William Mielcke as the sole member. In July of 2001, William Mielcke resigned from the Committee. In July of 2001, MKP assigned its power to appoint the members of the Committee to the Bluffs homeowners' association, pursuant to Section 8.2 of the CCRs. The homeowners' association then appointed its en-

tire board of directors to serve on the Committee. The Committee hired the Honolulu architectural firm of Stringer, Tusher & Associates to perform technical reviews of lot owners' plans.

According to Defendants, in early September of 1999, Plaintiff Guy Hands contacted Big Island real estate broker Deborah Au regarding the acquisition of a residential lot on the Kohala Coast of the Big Island. According to Defendants, Plaintiff Guy Hands asked Ms. Au twice whether pools were permitted in the SSA, and in reply, she sent him documents saying that the Committee would allow pools in the area.

On September 20, 1999, Plaintiffs Hands entered into a contract with Defendant Mauna Kea Development Corporation ("MKDC") to purchase Lot 5 at the Bluffs. On or about November 5, 1999, Plaintiffs Hands assigned their interest in the sales contract to Plaintiff WSP. On January 24, 2000, Plaintiff WSP completed the purchase. Defendants contend that the sales documents that Plaintiff WSP received disclosed that variances were granted to the owners of consolidated Lots 1 and 2.

In September of 2000, Plaintiff WSP engaged Mr. Lucky Bennett as its architect. It received variances from the Committee for roof design, roofing materials, and paving materials. It also received a variance to build a rock wall, gate, boulders, and a ditch within the special setback area ("SSA") of Lot 5. According to Defendants, Plaintiff WSP purchased Lot 5 as an investment. Defendants note that six weeks after it bought the property, Plaintiffs received an offer to purchase the lot for $6,500,000, approximately double what it had paid for the lot.

Defendants are the owners of Lot 6, which is immediately north of Lot 5. Defendants engaged Hill Glazier Architects ("HGA") to design their home. In July 2000, Defendants submitted preliminary plans to the Committee showing a swimming pool, spa, terrace, and two palapas, or small pavilions within the SSA of Lot 6. The Committee approved the design with the exception of the palapas. According to Defendants, Mr. Mielcke, at that point the only member of the Committee, visited Lot 6 with HGA's local architect and the Committee's consulting architect. Pursuant to the inspection, Defendants were told they had to lower the elevation of the pool and terrace in order to safeguard the view from Lot 5.

In late 2001, Defendants state that they asked the new Committee, which was composed of the homeowners' association, to approve the final plans and grant the requested variances in the SSA. On November 30, 2001, the Committee informed Defendants that it would not grant a variance for the palapas. After Defendants again revised their plans, the Committee approved the plans and granted the variance for a construction of a pool, spa, and terrace within the SSA on February 7, 2002.

Defendants began construction in March of 2002. Defendants state that Plaintiff WSP's architect, Mr. Bennett, visited the Bluffs approximately once a month to inspect Lot 5. Defendants allege he must have seen the work occurring on Lot 6. By August of 2002, Defendants state that the pool and terrace were fully excavated. Defendants also state that there were three feet high white stakes placed on Lot 6 showing the location of the special setback line. Accordingly, Defendants argue that the location of the pool and terrace within the SSA should have been obvious to a casual observer.

Plaintiffs paint a slightly different picture of Defendants' review process. Plaintiffs state that Defendant Irwin Federman had previously described himself as a "habitual non-complier" who had acted in a "cavalier" manner and had in fact acknowledged that he should not have placed his

pool where he did. Plaintiffs also allege that Defendants knew that structures such as a pool and terrace could not be built in the SSA. Plaintiffs state that the Realtor, who was working as a dual agent for both Defendants and MKP, specifically informed them of the large special setback area on Lot 6 when they were deciding between Lot 6 and Lot 9, and informed them that a pool could not be built there. After the purchase but before construction began, the developer allegedly told Defendants that "considerable controversy" existed over the issue of allowing structures within the SSA. Plaintiffs state that Defendants' own architect suggested moving the structures in question out of the SSA before they were built.

Plaintiffs argue that the reason Defendants felt confident in building the structures at issue here was because they allege that Defendants had connections on the Committee that enabled them to get the required approval. Defendants allegedly stated that they were "associated" with members of the Committee. Plaintiffs state that Defendants' attorney, engineer, and co-conspirator on the alleged scheme, were all on the Committee at some point during the approval process. Plaintiffs claim that none of the alleged conflicts were disclosed.

Specifically at issue in the instant motion is Section 4.17 of the Design Requirements which provides for the SSA on Bluffs residential lots. Section 4.17 prohibits the construction of any "building or structure" within special setback areas in order to "protect views and preserve hillsides." Defendants' CSOF Ex. 4. Section 8.8 of the CCRs, however, gives the Committee authority to grant variances from Design Requirements on the Property. Defendants' CSOF Ex. 3. Section 8.8 reads as follows:

> Notwithstanding anything to the contrary contained in this Article VIII, the Design Committee may approve plans, specifications, and other materials submitted to it for buildings or improvements which are not in strict compliance with the applicable Design Requirements if any such building or improvement is suitable to the area in which it will be located.

*Id.* at p. 31.

According to Defendants, design review is a two-stage process. The owner must first give the committee conceptual plans and obtain a preliminary approval under Section 5.3.1. of the Design Requirements. In the second stage, the owner gives the Committee more detailed construction plans. The Committee then grants final approval for construction under Section 5.2.4 of the Design Requirements. Defendants state that the Design Committee is not required to consult with other lot owners during either stage of the approval process. Plaintiffs state that other homeowners obtained their neighbors' approval before building in SSA. They also state that Article 12.5 of the CCRs give Homeowners the right to enforce the CCRs.[1]

---

1. Article 12.5 reads: In addition to any other remedies herein provided, each provision to this Declaration with respect to an Owner or the Lot of an Owner shall be enforceable by the Association, by Declarant, or by any Owner by a proceeding for a prohibitive or mandatory injunction or by a suit or action to recover damages. If any court proceedings are instituted in connection with the right of enforcement and remedies provided in this Declaration, the prevailing party shall be entitled to recover from the losing party its costs and expenses in connection therewith, including attorneys fees. Notwithstanding anything to the contrary contained herein, Declarant shall have no obligation to enforce any of the provisions of this Declaration. The failure to enforce any provision hereof shall not constitute a waiver of any right to enforce such provision or any other provision hereof. Defendants' CSOF Ex. 3.

Defendants contend that the Committee has the authority under Section 8.8 of the CCRs to grant a variance from any and all Design Requirements pertaining to the property. In support, Defendants point to Article VI of the Design Requirements which they argue provides the Committee with broad discretion to allow variances:

> Individual solutions at variance with the general design requirements will be considered on their architectural merit and their contributions to the overall purposes set forth in Article I and the specific objectives states in Article IV above. The Design Committee through the Design Review Procedure as authorized in Article V above, shall be the sole judge of the suitability of such variations in revelation to the established objectives.

Ex. 4 at p. 12 to Defendants' Motion for Summary Judgment.

Plaintiffs allege that the Committee cannot grant variances to the SSA as it is not part of the general design requirements but is rather a construction compliance issue. Moreover, Committee approval of a particular design does not necessarily mean that the construction is in compliance. Plaintiffs allege that Defendants' construction of a pool, terrace, and bar located in the SSA are in violation of the various governing documents, are unreasonable, and are not in good faith. They further contend that other owners in the Bluffs received their neighbors' approval before building structures in the SSAs.

The instant motion also involves Plaintiffs' claim that Defendants lied when they reported to the Bureau that the purchase price of their home was $3,000,000, which included a landscaping credit of $450,000. Plaintiffs allege that MKP, MKDC, and Defendants falsely reported the sale price of Lot 6 to Deborah Au, Plaintiffs Hands and Plaintiff WSP's realtor, to the multiple listing service, and to the tax authorities.

Plaintiffs state that in reality, Defendants' sales contract, dated December 27, 1998, reveals that the lot actually sold for $2.55 million. Plaintiffs contend that the scheme was perpetrated by the named Defendants, all of whom had an economic interest in the scheme via the use of artificial landscaping credits. Plaintiffs state that they were deprived, as well as all subsequent purchasers of accurate market information. Plaintiffs state that they relied on the false information supplied to them when purchasing Lot 5 of the Bluffs.

Defendants claim that they did not report their purchase price to any real estate agent or the Multiple Listing Service. Moreover, they state that they did not discuss the purchase price for Lot 6 with Guy Hands, Julia Hands, or any other representative of Plaintiff WSP.

## STANDARD OF REVIEW

As set forth in Federal Rule of Civil Procedure 56(c), summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c) (2003).

In its motion for summary judgment, the moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact and that the court may rule on the issues as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Despite this burden, the moving party need not produce evidence negating the existence of an element for which the opposing party will

bear the ultimate burden of proof at trial. *See id.* at 323, 106 S.Ct. 2548.

Once the movant has met its initial burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. *See* Fed. R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). Moreover, there is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *See id.* The evidence submitted by the nonmovant in opposition to a motion for summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *See id.* at 254, 106 S.Ct. 2505. The court must assess the adequacy of the non-movant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

Although highly fact-based cases are not generally suitable for summary judgment, the nonmoving party must demonstrate that sufficient evidence of a factual dispute exists to require a jury or judge to resolve the parties' differing versions of the truth at trial. In ruling on such a motion, this court may not make credibility determinations or weigh conflicting evidence. *See Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

## DISCUSSION

### I. Count II: Breach of Governing Documents and Protective Covenants, Conditions and Restrictions

Plaintiffs allege that Defendants are in violation of the Governing Documents and that the Committee exceeded its authority if it did in fact grant Defendants a variance. The court, however, need not address the issue of whether or not the Design Committee had authority to grant Defendants a variance to build in the setback area because as discussed, *infra,* Section 4.17 was effectively abandoned to the extent that it disallowed structures that did not block views in the special setback area.

### II. Abandonment

■ Defendants argue that Section 4.17 has been abandoned because the subdivision has acquiesced in substantial and general violations of the CCRs. Section 4.17 provides that "[n]o building or structure shall be placed within the special setback areas ...." Defendants' CSOF Ex. 4, § 4.17. Defendants state that the setback requirements in the SSA were abandoned from the very start of the Bluffs development. The first improvements built at the Bluffs was on Lots 1 and 2, which included construction of a pool and terrace in the setback area. Defendants state that Lots 1, 2, 3, 4, 5,6, 8, 11, and 12 have all

requested and been given variances in the SSA.

Abandonment is a question of fact, and the burden of proof rests on the defendant. *Sandstrom v. Larsen,* 59 Haw. 491, 496, 583 P.2d 971 (1978). Defendants must show that "the lot owners of the subdivision acquiesced in substantial and general violations of the covenant within the restricted area." *Id.* at 497, 583 P.2d 971 (further citations omitted). Failure to enforce covenants against a single property does not result in abandonment. *Kalenka v. Taylor,* 896 P.2d 222, 226 (Alaska 1995) (further citations omitted).

The court finds that Section 4.17 was abandoned in that pools or terraces that did not block views were consistently permitted in the special setback area. The Bluffs does not present a case where a single property, or even a handful of properties have built in the setback area. Instead, all of the oceanfront lots, namely Lots 1 through 12, including Plaintiffs' lot, have received one or more variances to build or make improvements in the special setback area. Lots 1, 2, 6, 8, 11, and 12 have received variances to build pools and terraces in the special setback area. Defendants' CSOF, No. 17, 39, 57. In fact, Plaintiffs' own architect received approval for terraces in the setback area of Lots 3 and 4.[2] *Id.* No. 12. The fact that specific types of construction were permitted in the setback areas appears to have been well-known as even Plaintiffs' builder and architect knew that several properties in the Bluffs had structures in the setback area. *Id.* Ex. 6, 96:23—98:25, 152:24—154:25.

Plaintiff Guy Hands specifically requested information regarding whether a pool could be build in the Special Setback area from his realtor, Ms. Au. Ms. Au twice sent him a document entitled "Questions and Answers for The Bluffs" that stated that "a pool or other structure that *does not block views*" can be built in the "special" setbacks. *Id.* Ex. 17, 21. Accordingly, because it appears that all of the Oceanfront lots have received variances to build in the setback area, making up over half of the total lots at the Bluffs, the court finds that Section 4.17 has been effectively abandoned as it pertains to structures built in the setback area that do not block views. Defendants' pool, through its alleged glare alone, does not "block" Plaintiffs' view.[3] Therefore, the court finds in favor of Defendants on its claim for summary judgment on its claim for abandonment.

### III. *Laches*

Defendants allege that Plaintiffs should be barred from receiving relief due to the equitable doctrine of laches. Defendants state that Plaintiff WSP should have been aware of the location of the pool and terrace as early as August 2002, when Plaintiffs Hands visited Lot 5, because Defendants were openly constructing these improvements. Plaintiffs filed their initial Complaint on August 7, 2003. Defendants state that they would be prejudiced now if their improvements were barred because the pool and terrace are almost completed.

---

**2.** The court recognizes that because Lots 3 and 4 were built prior to the adoption of the CCRs, the lots were permitted to have structures built in the setback area. However, the fact that both lots have pools is another indication of the general aesthetic of the Bluffs community, and suggests that as a whole, building in the setback area was permitted.

**3.** The court notes that at the hearing, Plaintiffs pointed out that Defendants' pool has not yet been filled. The court is thereby unclear as to precisely how Plaintiffs are so convinced that they would even be affected by glare from the pool as there was no water in the pool at the time of his hearing..

■ In order to have a claim for laches, Defendants must establish two factors. First, there must have been a delay by the plaintiff in bringing his claim, and "that delay must have been unreasonable under the circumstances." *Pelosi v. Wailea Ranch Estates*, 91 Hawai'i 478, 490, 985 P.2d 1045. "Delay is reasonable if the claim was brought without under delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him." *Adair v. Hustace*, 64 Haw. 314, 321, 640 P.2d 294 (1982). In addition to being unreasonable, the delay must have resulted in prejudice to Defendants. *Id.*

■ In August of 2002, Plaintiffs Julia and Guy Hands visited Lot 5 on more than one occasion. Defendants' CSOF Ex. 6–7. Julia Hands stated in her deposition that while she knew construction had started on Lot 6, she maintains that it was still primarily a "vacant lot." Defendants' CSOF Ex. 7, J. Hands Deposition at 142:8. However, as of the end of July of 2002, significant construction was visible on Lot 6. *See* Defendants' CSOF, Ex. 56.[4] Defendants note that Mr. Bennet, Plaintiff WSP's architect, also knew that several homeowners at the Bluffs were constructing pools and terraces within the special setback area, because he himself requested and received approval to build a terrace, spa, and pool partly within Lot 12's setback, as well as a rock wall on Lot 13's setback. *See* Defendants' CSOF Ex. 39, 42.

Plaintiffs, however, did not express its concerns regarding Defendants' construction until April of 2003, over seven months later. The instant case was not filed until August of 2003, a full year after Plaintiffs should have noticed the construction on Defendants' lot within the special setback area. Plaintiffs do not explain why they waited seven months to even voice their concerns about Defendants' construction in the special setback area. By the time they did complain, Defendants had already poured the foundation for their pool, making it prohibitively expensive to remove if mandated by court order.

Plaintiffs state that even if they had noticed construction occurring in the setback, they did not necessarily know that Defendants were building a pool. Given that Plaintiffs are arguing that Defendants should not have been permitted to build any structure in the setback area, it appears that if it truly was of concern to them, they should have voiced their concerns regardless of what was being built in that area. The court further notes that given the extent of the construction as of July 30, 2002, Plaintiffs should have known that some type of structure, not just an underground improvement, was being built in the setback area. *See* Ex. 56 to Defendants' CSOF. However, given that the court finds that Section 4.17 was effectively abandoned since the Bluffs inception, Plaintiffs are regardless not entitled to injunctive relief against Defendants.

IV. *Nuisance*

■ Plaintiffs next allege that Defendants' use of the property has created an unreasonable and substantial interference with Plaintiffs' use and enjoyment of Lot 5, and is thereby a nuisance. Plaintiffs allege that they have suffered diminution in value, loss of view plane, and loss of enjoyment of Lot 5.

A private nuisance has been defined as " 'a nontrespassory invasion of another's interest in the private use and enjoyment of his land.' " *Layton v. Yankee Caithness*

4. Specifically, by the end of July, significant parts of the South Pavilion, Pool Bath, and Pool Equipment Room were constructed in the Special Setback Area. *See* Defendants' CSOF, Ex. 55.

*Joint Venture,* 774 F.Supp. 576, 577 (D.Nev.1991) (citing Restatement (Second) of Torts, § 821D (1979)). The court finds that Plaintiffs simply cannot establish that a pool and terrace in any way diminishes their view from their lot. Mielcke and the Design Committee's consultant visited Lot 6 twice prior to granting Defendants' approval, one time even walking up to Lot 5, and determined that the views from Lot 5 would be unaffected by Defendants' proposed plans to build in the special setback area. Defendants' CSOF No. 37. To the extent that Defendants' planned palapas blocked views, the Design Committee requested that the plans be changed. Ex. 29 to Defendants' CSOF. Defendants' architect Hill Glazier Architects also lowered the pool and terrace by eight feet, and changed the palapas to trellised pavilions, and ultimately eradicated them from the plans. *Id.* No. 38.

Plaintiffs have also not established that their home has suffered a diminution in value. To the contrary, Defendants have pointed out that Plaintiffs received an offer of $6.5 million to purchase Lot 5 soon after Plaintiffs bought it, and listed the lot at a price of $7 million in July of 2000, via an exclusive right-to-sell agreement with MacArthur & Company. Defendants' CSOF No. 30; MKP's and MKDC's Memorandum in Opposition to Plaintiffs' Counter Motion for Summary Judgment ("MKP's and MKDC's Position Statement") at 10. Accordingly, Plaintiffs only stood to gain from the sale of their property, irregardless of Defendants' pool.

Finally, Plaintiffs cannot allege loss of enjoyment of their property because as they continuously stress, Defendants' pool is not yet entirely built, and in fact has not yet been filled with water. Plaintiffs therefore cannot establish that their views are in some way blocked by a glare coming off the pool. It appears to the court that in reality, Plaintiffs are actually upset about the type of view they are now afforded given their neighbor's construction of a pool. In essence, Plaintiffs are requesting that this court permit them to exercise personal veto power over their neighbor's aesthetic choices. Such a position is simply untenable and will not be enforced by this court. Accordingly, Plaintiffs' claim for nuisance is DENIED and the court grants summary judgment in favor of Defendants.

## V. *Clean Hands*

Defendants state that Plaintiffs should not be entitled to relief prohibiting Defendants from construction improvements in the SSA, where Plaintiff WSP itself obtained a variance from the same setback requirements. Specifically, Plaintiff WSP received a variance to build a rock wall, gate, boulders, and a ditch. Defendants state that Plaintiffs are therefore in no equitable position to receive injunctive relief. Plaintiffs respond by saying that the ditch was installed as a minor ditch barrier designed to provide security and preserve views by making the barrier at and below grade.

The court agrees with Defendants that Plaintiffs cannot effectively claim that the Design Committee did not have power to grant variances in the special setback area, when they themselves requested and received variances from the Committee. However, because the court has already found that Section 4.17 has been abandoned as it applies to structures that do not block the view built in the special setback area, Defendants' argument is moot.

## VI. *Hundred–Foot Shoreline Setback*

Defendants first state that although it was not expressly stated in its Amended Complaint, Plaintiffs appear to contend that Defendants' construction vio-

lates an alleged one-hundred foot setback mandated by the SMA procedures pursuant to the CZMA. *See* H.R.S. Chapter 205A. Defendants argue that the setback does not exist, and the even if it did exist, Plaintiffs do not have a private right of action to enforce it, and Defendants' improvements would not otherwise violate it.

The court finds that there is no private right of action to enforce a shoreline setback. The statute reads in pertinent part:

> (a) The department or an agency designated by department rules shall enforce this part . . . .

H.R.S. § 205A—43.6. The statute includes the following definitions:

> "Department" means the planning department in the counties of Kauai, Maui, and Hawaii, and the department of land utilization in the city and county of Honolulu, or other appropriate agency as designated by the county councils.

> "Agency" means any agency, board commission, department, or officer of a county government or the state government, including the authority as defined in Part II.

H.R.S. § 205A–1, 22. Accordingly, because the agency or department is given exclusive power to enforce setbacks, Plaintiffs are not the appropriate party to bring an action against Defendants for an alleged violation of that setback.[5]

## VII. *Count III: Negligent or Intentional Misrepresentation/Fraud*

Plaintiffs allege that Defendants, MKP, and MKDC made intentional and negligent misrepresentations, and engaged in fraud by falsely reporting the sale price of Lot 6 to the State of Hawaii Bureau of Conveyances ("The Bureau"), the Multiple Listing Service ("MLS"), and the State of Hawaii tax authorities. Plaintiffs assert that the Defendants inflated the fair market value of the properties in its reporting to the authorities so that it could demand a greater price from subsequent purchasers of the properties. Plaintiffs also allege that Defendants MKP and MKDC failed to disclose and/or misrepresented the actual conditions in the neighborhood by representing that setback rules would be enforced to protect view plans, and by failing to inform Plaintiffs that it was not enforcing the setback rules as set forth in the governing documents. Plaintiffs state that they relied on the misrepresentations when deciding to purchase Lot 5, and as a result, suffered damage including but not limited to diminution in value, loss of view plane, loss of enjoyment of Lot 5, and inflated sales price of Lot 5.

Plaintiffs allege that MKP offered a sales contract that listed that all lots were to be sold "as is." That is, any purchaser assumed the obligation to landscape or grade the lot. Plaintiffs contend that Defendants purchased Lot 6 for $2,550,000, $450,000 below the full price list price.

---

**5.** The only case Plaintiffs cite in support of their argument that they have a right to enforce the 100 foot county setback is entirely inapposite. Plaintiffs argue that *Akau v. Olohana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982) stands for the proposition that "only Counties can be sued for violating public rights" is erroneous. In making the argument, Plaintiffs both misconstrue Defendants' argument and misread the case. First, Defendants are not arguing that they cannot be sued for the violation of a setback. Instead, they argue that Plaintiffs are simply not the appropriate party to enforce an alleged violation of a setback, and that the appropriate department or agency are the only entities designated with the authority to sue them for a potential violation. Second, *Akau* involved the issue of whether a private individual had standing to sue for the abatement of a public nuisance. Since the case did not involve H.R.S. § 205A, it is entirely irrelevant to our analysis in the instant case.

Plaintiffs avers that MKP made a secret agreement with Defendants to keep the price of the property confidential in order to list the price with the authorities at $3,000,000. Plaintiffs allege that the $450,000 difference was a scheme whereby the difference in the actual selling price would be increased by a fictitious landscape credit but never reported as such to the authorities. Plaintiffs maintain that they offered to pay the full purchase price because after seeing that all of the other lots sold at the list price, they assumed that MKP would not be amenable to bargaining. Plaintiffs claims that as a result of the above conduct, Defendants and MKP are responsible for Plaintiffs' damages as civil co-conspirators and joint tortfeasors.

Defendants state that Plaintiffs cannot possibly make the necessary showing required to establish a claim of negligent or intentional misrepresentation. Specifically, Defendants argue that negligent misrepresentation requires communication between two parties. Defendants state that because they never made any representation to Plaintiff WSP, and Plaintiff WSP does not claim otherwise, that Plaintiffs cannot establish a claim for negligent misrepresentation. Defendants also state that any claim premised on misrepresentation made to tax authorities on a conveyance tax certificate cannot support a claim for negligent misrepresentation, because negligent misrepresentation requires that the party for whose benefit the information was supplied, suffer a loss. The information at issue here was allegedly given to the State of Hawaii's Bureau of Conveyances, and to Plaintiff WSP.

Defendants next argue that Plaintiffs also do not have a claim for fraud. Fraud requires that Defendants have reported the price of their lot to an individual who relied on the information. Defendants state that it did not falsely report the price of its home in order to induce Plaintiff WSP to take any particular course of action. With respect to both Plaintiffs' negligent misrepresentation and fraud claim, Defendants argue that Plaintiffs are unable to show damages. In support of their argument, Defendants point to the fact that Plaintiffs were offered $6,500,000 for their home two months after it was purchased.

a. *Fraud*

■ In Hawaii, a party claiming fraud must establish, by clear and convincing evidence, that "(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them." *Shoppe v. Gucci America, Inc.,* 94 Hawai'i 368, 369, 14 P.3d 1049, 1067 (2000).

■ The court notes that Defendants did make a false representation that they knew to be false. Ex. 98 to Plaintiffs' CSOF. Plaintiffs noted at the hearing that Defendants agreed to sign an agreement with the Association to keep the price of their home confidential. Defendants also reported on their Conveyance Tax Certificate that they had purchased their home for 3 million dollars. Plaintiffs' CSOF Ex. 99.

The court finds that there is, however, an issue of fact as to whether or not Defendants made the misrepresentation in contemplation of Plaintiffs' reliance on the information. Specifically, Plaintiffs argue that in reporting an inflated price of their home to the Bureau, Defendants had to expect that other prospective purchasers would rely on the information when making their bids on analogous lots, as is apparently common practice when parties purchase real property. *See* Plaintiffs'

CSOF, Ex. 25. Further, Defendant Irwin Federman admitted that he knew that he misreported the price for the purpose of allowing MKP to "maintain the recorded sales price at the amount originally listed." *Id.*, Ex. 98.

Defendants' position would presumably be that if it had any motivation at all in falsely reporting the purchase price of their home, it would have been to secure the discounted price of their lot.[6] Defendants also argue that regardless of their intent, fraud requires that they have communicated the price of their home to Plaintiffs, which they did not do.

The court disagrees. Courts have held that with respect to a negligent misrepresentation, the defendant need not have a particular person in mind as the intended, or even the probable recipient of the information. *Kohala Agr. v. Deloitte & Touche*, 86 Hawai'i 301, 330, 949 P.2d 141 (1997) (quoting Section 552 of the Second Restatement of Torts, comment h). Instead, it is sufficient "that the maker of the representation intends it to reach and influence either a particular person or persons, known to him [or her], *or a group or class of persons,* distinct from the much larger class who might be reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." *Id.* The *Kohala* court further noted that "the scope of liability for negligent misrepresentations is narrower than that for fraudulent misrepresentations because of the correspondingly lesser degree of fault for negligent misrepresentations." *Id.* at 321, 949 P.2d 141.

■ The court finds that if the tort of fraud has a broader range of liability, surely a defendant need not have contemplated the precise identity of the plaintiff, or person who would ultimately rely on the information, as that is not even required of a defendant charged with the narrower tort of negligent misrepresentation. Accordingly, Defendants' argument that because it did not specifically relay the information to Plaintiffs, or that it did not know the precise plaintiffs who might rely on the information, it does not have liability for fraud is erroneous. Instead, the court finds that it is a question of fact as to whether Defendants should have known that prospective buyers, as a class, would rely on their misrepresentation of the selling price, and whether they in fact contemplated such reliance.

■ There are also issues of fact as to whether or not Plaintiffs relied on the list price in making their offer, and whether Plaintiffs sustained any damages. According to MKP and MKDC, Plaintiffs did not actually rely upon the reported prices of lots at the Bluffs when they decided to purchase Lot 5. They state that Plaintiffs were interested in purchasing only a waterfront lot, and were informed that Lot 5 was the last available. MKP's and MKDC's Position Statement at 19. They aver that Plaintiffs made inquiries into orientation, topography, buildable area, construction requirements, common areas, maintenance fees, and beach access. *Id.* They maintain that Plaintiffs did not make any inquiries into the selling prices of the other lots. *Id.* at 19.

6. The court can only guess at Defendants' argument because up until Plaintiffs submitted conclusive proof that Defendant Irwin Federman knew that the landscaping credit was an artifice, Defendants maintained in their papers that Defendant Federmans had solely agreed to keep the terms of their transaction with Defendant MKP confidential, and had not discussed the fact that Defendant Irwin Federman had made an affirmative misrepresentation to the Bureau.

Within a week, Plaintiffs drafted two offers for Lot 5 which were allegedly ready for submission on September 20, 1999. *Id.* at 19 (citing Defendants' Exhibits O, P; Plaintiffs' CSOF at Exhibit 19). M.P. and MKDC state that it was not until 10:45 pm when Plaintiffs' realtor, Ms. Au, confirmed the selling prices at the Bluffs for Plaintiffs. *Id.* (citing Defendants' CS at Ex. Q.) Defendants MKP and MKDC also note that Plaintiffs did not appear to be concerned with price as they expressed concerns primarily about easements and possibility of lava flows, and their ability to obtain membership to The Club at the Bluffs. They state that Plaintiffs' did not even order an appraisal of Lot 5 prior to purchasing the lot. *Id.* (citing Defendants' CS at Ex. B).

Plaintiffs, however, paint a different picture regarding the events that transpired prior to their purchase of Lot 5. They note that MKDC told Plaintiffs' realtor that the list prices were firm. Plaintiffs' CSOF Ex.3, pp. 94–95, 97–98. On September 12, 1999, Ms. Au sent Plaintiffs Hands a fax which included a price list for lots that had either been sold at the Bluffs, or were for sale. *Id.,* Ex. 2. The price listed for Defendants' lot was $3,000,000, although it is unclear from the document whether the price shown was the sale price or the list price. *Id.* Plaintiffs argue that contrary to Defendants assertion that they did not look at comparables until late in the evening on September 20, 1999, they actually received price information more than a week earlier.

Further, even if the prices shown in Ms. Au's fax were the list prices, and Plaintiffs only saw the actual comparables the evening they made the offer, Plaintiffs had up to a week after they put an offer in on the property to cancel their purchase. Assuming that they might have retracted their bid had they known the prices were not accurate as provided to them by Ms. Au, there is an issue of fact as to whether or not Plaintiffs relied on Defendants' misrepresentation.

Finally, Plaintiffs state that the reason why they sent two proposals to MKDC at the same time was because they believed the prices were firm, they did not think that they could bargain for a better price. Plaintiff Guy Hands stated in his declaration that had he known that Defendants actually paid $2,550,000 for their lot, and that other lots also sold for significantly less than list price, they would not have offered the list price of $3,250,000 for their lot.

Defendants state in response that it is merely speculative to assume that Plaintiffs would have been able to secure a discount, regardless of whether or not they had been correctly informed of the sales price of the Defendants' lot. Moreover, MKDC and MKP stated they did not need to offer Plaintiffs a lower price on the purchase of their Lot because at the time of purchase, the real estate market on the Big Island was starting to improve.[7] Again, the court finds that there is an issue of fact as to whether or not Plaintiffs sustained any damages from its reliance on Defendants' misrepresentation. Accordingly, the court DENIES Defendants' Motion for Summary Judgment on the issue of fraud, and DENIES Plaintiffs' Motion for Summary Judgment on the Issue of fraud.

### b. *Negligent Misrepresentation*

█ As stated in the Restatement (Second) of Torts § 552, and expressly

---

7. Although Plaintiffs bitterly contest that the market was improving stating that Defendants have offered no proof of this fact, in a letter addressed to Plaintiff Guy Hands, Plaintiffs' realtor Ms. Au confirmed that the "market was starting to move." Plaintiffs' CSOF, Ex. 2.

adopted in this jurisdiction by *Chun v. Park*, 51 Haw. 462, 462 P.2d 905 (1969), negligent misrepresentation occurs when:

[o]ne who, in the course of his [or her] business, profession or employment, or in any other transaction in which he [or she] has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 at 126–127. In order to establish a cause of action for negligent misrepresentation, Plaintiffs must show that "(1) false information [was] supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information [was] supplied suffered the loss; and (3) the recipient relies upon the misrepresentation." *Blair v. Ing*, 95 Hawai'i 247, 269, 21 P.3d 452 (2001).

 As discussed, *supra*, there are several genuine issues of material fact that preclude the court from deciding Plaintiffs' claim at the summary judgment stage. Specifically, while it is apparent that Defendant Irwin Federman made a misrepresentation, there are several facts in dispute as to whether Plaintiffs suffered any damages from the misrepresentation, and whether they actually even relied on it. The court therefore DENIES Defendants' Motion for Summary Judgment on Plaintiffs' claim for Negligent Misrepresentation, and DENIES Plaintiffs' Motion for Summary Judgment on its claim for Negligent Misrepresentation.

## VIII. *Conspiracy*

Plaintiffs next maintain that Defendants acted in concert to commit the above acts and are therefore jointly and severally liable. Defendants state that Plaintiffs' claim constitutes a conclusory allegation and should be dismissed on that ground alone. However, to the extent that the above counts are dismissed as to Defendants, they assert that this count should also be dismissed.

 A claim of civil conspiracy does not in and of itself constitute a claim for relief. *Robert's Hawai'i School Bus v. Laupahoehoe*, 91 Haw. 260, n. 44, 982 P.2d 853 (1999) (further citations omitted). Instead, "the gravamen of the tort is not the agreement charged, but the acts in pursuance of the agreement which are the tort". *Ingle v. Liberty House, Inc.*, 1995 WL 757746, * 6 (Hawai'i Cir.Ct.). However, "[m]ere acquiescence or knowledge is insufficient to constitute a conspiracy, absent approval, cooperation, or agreement. *Roberts*, 91 Haw. at 260, n. 44, 982 P.2d 853 (further citations omitted). "When a conspiracy is established, everything said, written, or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been said, done, or written by every [member], and may be proved against each." *Kazuo Hashimoto v. Henry Halm*, 40 Haw. 354, 1953 WL 7576 *6, (Hawai'i Terr. Nov.20, 1953).

 As stated above, the court finds that there is an issue of material fact as to whether Defendants contemplated Plaintiffs' reliance on their intentional misrepresentation of the purchase price of their home. Defendant Irwin Federman himself stated in a letter to Jane Grisham, Director of Finance of the Real Property Department for the County of Hawaii, that the landscaping credit was just "an accounting artifice to enable Mauna Kea realty to maintain the recorded sales price at the amount originally listed." Plaintiffs' CSOF Ex. 98. Defendant Irwin Federman's statement indicates that he agreed

to under-report the price of his home to maintain the fiction that individuals at the Bluffs were purchasing lots at the list price.

As was the case in Plaintiffs' claim for fraud, whether or not Defendants made the above misrepresentation in contemplation of Plaintiffs' reliance, and whether Plaintiffs actually relied on the information are issues of material fact which preclude summary judgment. Again, the gravamen of a claim of civil conspiracy involves the underlying tort. Given that the court has before it some evidence of an agreement between Defendants and M.P., the court DENIES Defendants' Motion for Summary Judgment on Plaintiffs' claim for civil conspiracy. The court also DENIES Plaintiffs' Motion for Summary Judgment on the issue of civil conspiracy as there remain genuine issues of material fact regarding the underlying tort of fraud.

IX. *H.R.S. Chapter 480, Hawaii's Unfair and Deceptive Trade Practices Act*

Plaintiffs next argue that Defendants violated Hawaii Revised Statutes ("HRS") Chapter 480, Hawaii's Unfair and Deceptive Trade Practices Act. Plaintiffs Hands state that they committed money in the form of a personal investment to buy Lot 5 for personal, family, and household use. They maintain that one or more of Defendants participated, agreed to, conspired, and contracted to misrepresent, among other things, the sale prices of lots to Plaintiffs, and therefore fixed the price of the Bluffs' lots. Plaintiffs state that Plaintiff WSP is a "person" injured in its business or property as defined in Chapter 480 and that Plaintiffs Hands are "consumers" and "persons" as those terms are defined in the statute. Plaintiffs claim treble damages and attorneys fees pursuant to the statute.

Defendants state that Plaintiffs have no claim under Chapter 480 as the statute is inapplicable to the facts of the case. First, Defendants argue that Plaintiffs are not "consumers" such that they can bring an action for damages under H.R.S. § 480–13. Specifically, Plaintiff WSP, the alleged ultimate purchaser of the property, is not a "natural person" as required under H.R.S. § 480–1. Defendants state that Plaintiff WSP added Plaintiffs Guy and Julia Hands to the Complaint in an effort to circumvent the statute's requirement of needing a "consumer" to assert a claim. Defendants state that Plaintiffs approach was flawed for the following two reasons. First, the ultimate purchaser was actually Plaintiff WSP and not Plaintiffs Guy and Julia Hands. Next, Defendants state that even if Plaintiffs Hands could be considered the purchasers of Lot 5, they would be consumers only if purchasing Lot 5 for personal, family or household purpose. Defendants cite Plaintiff Guy Hands own testimony stating that the property was purchased for investment purposes.

Defendants next argue that they have no liability under H.R.S. § 480–2 as they are not involved, for purposes of the instant lawsuit, in the conduct of any trade or commerce. Finally, Defendants maintain that they have no liability under H.R.S. § 480–4, Hawaii's antitrust statute because it does not apply to disputes between neighboring landowners.

 First, the court finds that Plaintiff WSP does qualify as a "consumer" under the statute. Specifically, HRS § 480–1 defines a consumer as "a natural person who, primarily for personal, family, or household purposes, purchases ... goods or services or who commits money, property, or services in a personal investment". HRS § 480–1. HRS § 480–1 defines a "person" as including a corporation. *Robert's Hawaii School Bus., Inc. v. Laupahoehoe*

*Transportation Company, Inc.*, 91 Hawai'i 224, 248, 982 P.2d 853 (1999). Moreover, the purchase of real estate qualifies as a personal investment. *Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 67, 905 P.2d 29 (1995). Accordingly, regardless of whether Plaintiff WSP or Plaintiffs Hands purchased the property, either entity could be considered a person who committed money in a personal investment.

■ With respect to HRS § 480–2, the court agrees that Defendants cannot be held directly liable under the statute because they are not engaged in trade or commerce. In *Cieri*, the Hawaii Supreme Court held that as a matter of law, a broker or salesperson actively involved in a real estate transaction engages in the "conduct of any trade or commerce," for the purposes of § 480–2. *Cieri*, 80 Hawai'i at 60, 905 P.2d 29. However, the court stated that in an action against an owner/seller of property, the transaction must have occurred within a "business context." *Id.* Whether or not a particular transaction occurred in a business context would be determined on a case-by-case analysis of the transaction. *Id.*

In the instant case, Defendants did not own the property sold to Plaintiffs. However, as stated *supra*, the court has denied Defendants' Motion for Summary Judgment on Plaintiffs' claim for conspiracy. MKP and MKDC could still be held liable as they were arguably involved in trade or commerce. Accordingly, the court cannot, at this point, grant Defendants' Motion for Summary Judgment on Plaintiffs' § 480–2 claim, as Defendants may still be jointly and severally liable.

■ Finally, the court finds that HRS § 480–4 does not apply under the circumstances of the instant case. § 480–4, like Article 1 of the Sherman Antitrust Act, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State...." H.R.S. § 480–4; *Robert's*, 91 Hawai'i at 247, 982 P.2d 853. The Hawaii Antitrust statute forbids the monopolization of trade or commerce in any "commodity". H.R.S. § 480–4(b). § 480–1 defines the term commodity as including, but "not restricted to, goods, merchandise, produce, chooses in action, and any other article of commerce. It also includes trade or business in service trades, transportation, insurance, banking, lending advertising, bonding, and any other business." H.R.S. § 480–1.

The court finds that although the statute defined the word "commodity" to include "any other business," the purchase of real estate by an individual owner cannot be considered a business under the Hawai'i statute, pursuant to Ninth Circuit law on the subject. *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir.1977) (holding that the word "commodity" did not include cemetery lots).

Plaintiffs cite *Souza v. Estate of Bishop*, 594 F.Supp. 1480 (D.Haw.1984) in support of its § 480–4 claim, however, that case is inapposite. In *Souza*, the principal issue involved whether the Bishop Estate, historically the largest landowner in Oahu, monopolized the land market in its leasing practices of vast tracks of land. The *Souza* court, however, did not conclude that land necessarily fell under either the federal or Hawai'i antitrust statute but rather assumed it for the purposes of its analysis. It stated that its assumption was correct "only if there is considerable judicial stretching of the words used" in the federal and Hawai'i antitrust statutes. *Id.* at 1483, n. 2. This court declines to exercise in such judicial stretching here. The court thereby GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' Claim under H.R.S. § 480–4.

### X. *Hawaii's Uniform Land Sales Practices Act*

Plaintiffs next allege that Defendants violated the Hawaii Uniform Land Sales Practices Act ("HULPSA"), Chapter 480 of the Hawaii Revised Statutes. Specifically, Plaintiffs maintain that Defendants made misrepresentations of material fact and omitted material facts in a registration, statement, or an application, or public offering statement. Plaintiffs state that they relied on the untruths or omissions when they purchased Lot 5 and suffered damages in an amount to be shown at trial.

Defendants state that there is no factual or legal basis under HULPSA to sue Defendants. H.R.S. § 484–4 states:

(1) No person may offer or dispose of any interest in subdivided lands located in this state, or offer or dispose in this State of any interest in subdivided lands located without this State before a preliminary or final order registering the subdivided land is entered in accordance with this Chapter;

(2) No persons may dispose of any interest in subdivided lands unless a current public offering statement is delivered to the purchaser and the purchaser is afforded a reasonable opportunity to examine the public offering statement prior to the disposition.

H.R.S. § 484–4. Defendants state that they are not persons "offer[ing] or dispos[ing] of any interest in subdivided lands." Accordingly, Defendants state that Count VI should be dismissed for failure to state a claim

The court agrees with Defendants that they do not constitute persons who "offer or dispose of an interest in subdivided land," H.R.S. § 484–4. Defendants were not engaged in selling the property at the Bluffs, or any other property to the court's knowledge. However, at this stage in the litigation, it is still plausible that MKP and MKDC, who did engage in the selling of property at the Bluffs, violated § 484–4. As stated above, because there is some evidence of an agreement between Defendants Federmans and MKDC regarding the misreported price of their home, the court denied Defendants' Motion for Summary Judgment on Plaintiffs' conspiracy claim. If MKP and MKDC are found to have violated § 484–4, Defendants Federmans could be held jointly and severally liable if a conspiracy is found to have existed. Accordingly, the court DENIES Defendants' Motion for Summary Judgment on Plaintiffs' Claim under HULPSA.

### XI. *Claims for Breach of Contract, Breach of Warranty and/or Guaranty, and Breach of Covenant of Good Faith and Fair Dealing*

 Plaintiffs next make a claim for breach of contract, breach of warrant and/or guaranty, and breach of covenant of good faith and fair dealing. All of Plaintiffs' claims stem from contractual relationships it claims it has with Defendants, excepting the County, including the purchase agreement for Lot 5, and the CCRs and Design Requirements.

Defendants concede that the CCRs and Design Requirements constitute a contractual relationship between all of the lot owners at the Bluffs, however, they argue that there is no valid breach of contract claim. Defendants state that they followed all applicable procedures in the design and construction of their home, and they received a variance for construction of the pool and terrace. With respect to Plaintiffs' breach of warranty and/or guarantee, Defendants state that no claim can be made against them specifically because they did not make any warrantees to Plaintiffs. Finally, Defendants state that Plaintiffs have no claim for breach of the duty of good faith and fair dealing because

they complied with both the CCRs and Design Requirements.

As stated above, the court finds that Section 4.17, as it pertained to Defendants' construction in the setback area, was effectively abandoned. Accordingly, Defendants have not breached any contract or covenant, to the extent that either exists, with Plaintiffs. The court therefore GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' Claims for Breach of Contract, and Breach of Covenant of Good Faith and Fair Dealing.

Plaintiffs claim in Count VIII of its Amended Complaint that Defendants, excepting the county, "made express and/or implied warranties or guarantees that . . . . certain sale prices were paid for certain lots." As stated above, the court has not granted Defendants Federmans' Motion for Summary Judgment on Plaintiffs' conspiracy claim. Accordingly, if MKP and MKDC breached a warranty or guarantee that was in some way binding against them, Defendants Federmans would also be liable under a conspiracy theory. The court therefore DENIES Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Breach of Warranty and/or Guarantee.

### XII. Negligence

■ Plaintiffs allege that Defendants owed Plaintiffs a duty to exercise reasonable care and that one or more Defendants breached that duty by constructing or allowing to be constructed a pool, deck, spa, cluster of palm trees, and other structures in violation of the SMA and "special setback" area of Lot 6, by allowing actions that caused glare or reflection onto Lot 5 and an obstruction of the views from Lot 5.

Defendants respond by stating that they had no duty towards Plaintiffs. The only relationship between the parties was as owners at the Bluffs, and that they were bound by the same set of CCRs and De-

sign Requirements. Defendants say this relationship cannot give rise to any duty towards Plaintiffs. Defendants also state that even if some sort of duty could be inferred, it was not breached as Defendants claim that they complied entirely with the CCRs and Design Requirements in the construction of their Home.

Plaintiffs have not adequately alleged why Defendants owe them a duty of care such that they would liable under a negligence theory. Moreover, as stated above, the court has found that Defendants have not violated any of the CCRs or Design Requirements due to abandonment of Section 4.17. Accordingly, the court GRANTS Defendants' Motion for Summary Judgment on the issue of negligence.

### XIII. Breach of Fiduciary Duty

Plaintiffs allege that Defendants breached a fiduciary duty owed them. Defendants state that they owed no fiduciary duty to Plaintiffs because there is no basis for a fiduciary owed by Defendants to Plaintiffs. Again, while the court agrees with Defendants that homeowners owe no fiduciary duty to their neighbors, Plaintiffs also argue that MKP and MKDC owed them a fiduciary duty which was ultimately breached when they misreported the sales price of Defendants Federmans' lot.

MKP and MKDC are not before the court in the instant motion for summary judgment. The court therefore does not have before it sufficient information to make a ruling as to their liability on the issue of breach of fiduciary duty. Since Defendants Federmans could be jointly and severally liable for breach of fiduciary duty on the basis that they conspired with MKP and MKDC to misreport the price of their home, the court cannot grant Defendants' Motion for Summary Judgment on Plaintiffs' Breach of Fiduciary Duty. Accordingly, the court DENIES Defendants'

Motion for Summary Judgment on Plaintiffs' Breach of Fiduciary Duty.

### XIV. *Takings*

 Plaintiffs next state that Defendants' actions led to diminution of the value of Lot 5, as well as an uncompensated and illegal taking of a portion of Lot 5 without due process in violation of the Hawaii Constitution. Defendants state that a taking is not possible because they are not a governmental entity with the power of eminent domain.

The court finds that Plaintiffs cannot state a viable claim for a taking because Defendants are not a governmental entity, nor were their alleged actions taken pursuant to governmental regulation. Plaintiffs point to *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), for the proposition that any private party may effect a compensable taking of property. *Loretto,* however, involved a New York City landlord who sued a cable television company claiming that the company's installation of cable wire, conducted pursuant to New York law, was a compensable taking. In its opinion, the Court stated that it was presented with the question of "whether a minor but permanent physical occupation of an owner's property *authorized by government* constitutes a 'taking' of property for which just compensation is due under the Fifth and Fourteenth Amendments of the Constitution." 102 S.Ct at 3168 (emphasis added).

Plaintiffs clearly misconstrue the Supreme Court's holding in arguing that private homeowners could effectuate a compensable taking under the Fifth or Fourteenth Amendments. In fact, the sentence immediately after the one quoted by Plaintiffs in their opposition states as much: "[a] permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant." *Id.* at 3174, n. 9 (further citations omitted). Plaintiffs also argue that because homeowners' associations have been termed by some courts as being a veritable "private government," they should be restrained in the same manner as a public government. Plaintiffs' argument is without merit and completely without support.

### XV. *Attorneys' Fees*

In Count XV, Plaintiffs request attorneys' fees on three different bases. First, Plaintiffs allege that because the wrongful acts of Defendants caused Plaintiffs to become involved in litigation with others, or placed them in such a position so that it was necessary to incur expenses to protect their interests. Plaintiffs therefore request attorneys' fees pursuant to the Hawaii Supreme Court holding in *Uyemura v. Wick,* 57 Haw. 102, 551 P.2d 171 (1976). Plaintiffs next request attorneys' fees based on statutory law, and common law.

In their motion for summary judgment, Defendants request that this court grant them summary judgment on the issue of attorneys' fees requested pursuant to the holding in *Uyemura.* Defendants' Motion for Summary Judgment, at 34. Specifically, Defendants maintain that they have not caused Plaintiffs to enter into any litigation with others.

With respect to their *Uyemura* claim, Plaintiffs have again failed to cite a key portion of the ruling that makes it inapplicable to the instant case. Namely, the court stated that in order to recover attorneys' fees, the plaintiff need establish:

(1) that the plaintiff had become involved in a legal dispute either because of a breach of contract by the defendant, or because of defendant's tortious conduct, that is, that the party sought to be charged with the fees was guilty of a

wrongful or negligent act or breach of agreement; (2) that the litigation was with a third party, not with the defendant from whom the fees are sought to be recovered; (3) that the attorneys fees were incurred in that third-party litigation ...

*Uyemura,* 551 P.2d at 176 (further citations omitted). Plaintiffs have not argued that they are involved in any litigation aside from the instant case, which involves Defendants. Accordingly, Plaintiffs are not entitled to attorneys' fees under *Uyemura.*

Plaintiffs also claim that they are entitled to attorneys' fees pursuant to statutory and common law. Defendants, however, have not moved to dismiss Plaintiffs' claim for attorneys' fees based on statutory or common law. Accordingly, the court will not consider Plaintiffs' claims here.

### XVI. *Punitive or Exemplary Damages*

■ Plaintiffs also claim punitive damages in Count XVI. Plaintiffs argue that the following nine "triggers" entitle them to punitive damages: (1) fraud/misrepresentation; (2) wanton; (3) oppressive; (4) malicious; (5) reckless indifference; (6) aggravating circumstances; (7) conscious indifference; (8) gross negligence; (9) bad faith. Plaintiffs' Opposition at 40.

Defendants, however, cite *Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 971 P.2d 707 (1999), which expressly disallowed punitive damages in contract actions except in exceptional circumstances such as conduct that violates a duty that is independently recognized by principles of tort law, or transcends the breach of contract. 89 Hawai'i at 240, 971 P.2d 707. Defendants state that such facts simply do not exist in the present action. Moreover, Defendants state that a finding for punitive damages would be improper because a finding of actual damages is required prior to any finding of punitive damages. Final-

ly, Defendants state that in order for Plaintiffs to get punitive damages, it must show "by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference ...." Defendants' Motion for Summary Judgment at 23 (citing *Matsuda v. Wada,* 101 F.Supp.2d 1315, 1325 (D.Haw.1999)). Defendants state that their actions simply do not rise to the level required by Hawaii State law.

The court first notes that Plaintiffs have again misstated Hawaii law. In their motion, Plaintiffs argue that the holding in *Francis* was expressly limited to employment cases and that the court was "reluctant to open Pandoras' box in the *employment* setting and allow punitives—bad faith [sic]." Plaintiffs' Opposition at 41. In fact, the court spent a significant time broadly discussing the theories of contract and tort law. It held that its holding applied generally to breach of contract cases stating that "damages for emotional distress and mental suffering, as well as punitive damages, are generally *not* recoverable in contract." *Francis,* 89 Hawai'i at 240, 971 P.2d 707 (further citations omitted). The court, however, did carve out several exceptions and stated that damages for emotional distress are recoverable "only where the parties specifically provide for them in the contract or where the *nature* of the contract clearly indicates that such damages are within the contemplation or expectation of the parties." *Id.*

Plaintiffs have not established that either of the exceptions noted above apply to the instant case. Moreover, none of the actions Plaintiffs' allege were committed by Defendants arises to the level of wanton, oppressive, or malicious conduct. Instead, Defendants simply built their home pursuant to what they viewed as a valid approval of their construction plans.

Plaintiffs have not submitted any evidence that Defendants purposefully built their home with the purpose of harming Plaintiffs. Further, although Plaintiffs have presented some evidence that Defendants made a misrepresentation about the purchase price of their home, they have not presented any evidence that Defendants' conduct was malicious.

As stated above, the court has found that Defendants made a misrepresentation, that a trier of fact may conclude amounted to fraud. However, the court does not find that Defendants' misrepresentation amounts to wanton, oppressive or malicious conduct. Accordingly, the court GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' claim for punitive damages.

## CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Counter Motion for Summary Judgment.

IT IS SO ORDERED.